FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA  2008 AUG 11  AM 8: 51
## FORT MYERS DIVISION

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

Kenneth Lehman and Shelia Johnson
      Plaintiffs,

          V.                        Case No. 2:08-cv-530-FtM-34SPC

Lee County Sheriff Mike Scott, in his
Official and Individual Capacities,
Lee County Deputy Brian Prezpolewski,
Lee County Deputy Guillermo Quintana,
Lee County Deputy James Richard,
Lee County Deputy Lorrie Reaves; in their
 Individual capacities, and
Thomas Bulloch, Individually
      Defendants,
_____/

## PLAINTIFFS OPPOSED MOTION TO STRIKE DEFENDANTS
## ANSWER AND TO DENY ALL AFFIRMATIVE DEFENSES

    Pursuant to Federal Rules of Civil Procedure Rule 12(f);  Plaintiffs respectfully request this Honorable Court to Strike the Defendants  Scott, Prezpolewski, Quintana and Reaves identical Answer as it is contradictory, false and evasive. Defendants Answer fails to acknowledge recorded information; therefore, denies the Plaintiffs an opportunity to understand the Defendants position and to gather evidence needed to rebut the Defendants position with regard to these allegations.   Plaintiffs further request the Defendant's affirmative defenses be denied, as they too are based upon these false denials. Plaintiffs consoled with Mr. Shearman, counsel for LCSO, who opposed this motion .

    1.  Defendants admit that on or about June 5. 2006, Plaintiff Kenneth   LEHMAN

was taken into custody for the purposes of an involuntary Examination pursuant to

Florida Statute 394.463.   ALL   remaining allegations of the complaint are denied.

    2.  Defendants appear to base their Answer, a blanket denial, solely upon the fact that

LEHMAN   was taken into custody for the purposes of an involuntary examination,

pursuant to F.S. 394.463. This denial fails to address the use of handcuffs without clearly

documented dangerous circumstances and the unreasonable searches of the Plaintiffs'
home, their vehicles and their belongings.

3. Florida Statute 394.463   Involuntary Examination- (1) Criteria (Ex.12)  and the
Baker Act Handbook and User Reference Guide 2006 issued by the State of Florida
Department of Children and Families (BA Handbook) Appendix G-9 (Ex. 9) state that the
Baker Act form entitled Report of Law Enforcement Officer Initiating Involuntary
Examination (RLEO) (Ex. 4) must be completed when the officer initiates the
examination.

4. Quintana's RLEO (Ex. 4) is incomplete, it is incorrect and Quintana ignored the
specific information the form demands to be recorded to meet the criteria to initiate an
involuntary examination pursuant to  F.S. 394.463.

5. QUINTANA  had not completed Baker Act training offered through FMHI
therefore did not, and further could not, for the lack of proper training, give  LEHMAN  a
conscientious explanation and disclosure for the purpose of the examination. The RLEO
Section (1a) indicates  LEHMAN   did not refuse voluntary examination after
conscientious explanation and disclosure of the purposes of the examination. The RLEO
Section (1b) indicates  LEHMAN   was not unable to determine for himself whether the
examination is necessary. The RLEO Section (1) is correct.

6. The RELO Section (2),  QUINTANA   checked (2b) indicating that there is a
substantial likelihood without care or treatment, the person will cause serious bodily
harm to self and others, in the near future, as evidenced by recent behavior. Florida
Statute 394.463 (Ex.12) and the BA Handbook Appendix G-3 (Ex.8) states that the
evidence of likelihood of harm to self or others is defined solely by the persons "recent

behavior". The RLEO   demands that the officer record the circumstances supporting this (2b) opinion, including specific information about the person's behavior, threats and actions, and information offered by others.  QUINTANA  did not record any behavior, action or threat or any witness statements, QUINTANA   merely recorded that LEHMAN  was exhibiting fears and appeared to irrational in thoughts, which are "personal observations".

7.  Florida Statute 394.463 (Ex.12) and the BA Handbook Appendix G-3 (Ex.8) states that the law enforcement officers report detail the circumstances under which the person was taken into custody, not "personal observations". The RLEO Section (2) is incomplete as it does not detail any of  LEHMAN's  behavior, threats and actions as the form demands.  The RLEO Section (2) is incomplete as it does not record any information offered by others, including BULLOCH, as the form demands.   The RLEO Section (2) is incorrect, as "personal observations" are recorded in the section the form demands circumstances to be recorded, including the person's behavior, threats and actions. The RLEO Section (2)   is incomplete and it is incorrect, therefore the RLEO is incomplete, it is incorrect and  QUINTANA  ignored the specific information that the form demands to be recorded.

8.  LEHMAN  was handcuffed by PREZPOLEWSKI, yet the RLEO does not record any dangerous circumstances to justify the use of restraining devices.(Ex.6)  The Incident Recall Sheet (Ex.1) records that there are no other vehicle or subject records for Event  LSO060605190316.

9.  The RLEO documents that  LEHMAN  was subjected to an unreasonable Involuntary Baker Act Examination.  An unreasonable Baker Act Examination would not

be pursuant to F.S. 394.463.  Plaintiffs were subjected to further unreasonable searches of

their home, vehicles and belongings.  Unreasonable searches would not be pursuant to

F.S. 394.463.  The Defendants Answer is false.

10.  Defendant's Answer presents a distorted and misleading account of the Incident

because it fails to acknowledge the information that is recorded by LCSO documents.

Defendant's Answer creates a version of the Incidents that contradicts the recorded facts.

Defendant's  Answer is false, misleading, deceptive and intentionally evasive.


Federal Rules of Civil Procedure Rule 8 b (4) states:

>   A party that intends in good faith to deny only part of an
>   allegation  must admit the part that is true   and deny the rest.

Federal Rule 11 (b) states:

   By representing to the court a pleading, written motion, or other paper- whether
by signing, filing, submitting, or later advocating it- an attorney or unrepresented party
certifies that to the best of the persons knowledge, information, and belief formed after
an inquiry reasonable under the  circumstances:   (1)  it is not being  presented for any
improper purpose, such as  to harass, cause unnecessary delay, or needlessly increase the
cost of litigation.

Despite the existence of these Federal Rules of Civil Procedure, Defendants filed an
Answer denying the following statements ignoring recorded facts as follows:

Defendants Answer to Complaint averment  #

   #19.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1)

and LCSO Dispatch Sheet (Ex.2)

No threats, threatening behavior or violence was reported or recorded for the incident.

   #20.  Denial contradicts irrefutable videotaped evidence.

   #21.  Denial contradicts Statement signed by Deputy Santos (Ex 3)  Statement signed

by Deputy Santos that verifies the local harassment.

#22.  Denial contradicts irrefutable videotaped evidence.

#23.  Denial contradicts irrefutable videotaped evidence.

#24.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO Dispatch Sheet (Ex.2)  BULLOCH  did place a 911 emergency call detailing a non emergency situation.

#25.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO Dispatch Sheet (Ex.2)

#26.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO Dispatch Sheet (Ex.2)   LEHMAN's  recorded actions are dancing and videotaping.

#28.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO Dispatch Sheet (Ex.2)  BULLOCH  did not report any threats, threatening behavior or violence to LCSO during the 911 emergency call.

#30.  Denied, yet lawfully exercising one's constitutional rights cannot be perceived as a threat or harm to others

#31.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1)

#32.  Defendants deny even approaching LEHMAN or interrogating him.

#35.  A reasonable person would offer evidence that benefits himself. (Ex.3)

#40.  Denied, yet had Defendants not effectively seized LEHMAN through a show of authority, LEHMAN  was going to ignore the DEPUTIES that ignored the evidence, and walk away, ending the incident.

#41-43.  A reasonable person would offer evidence that benefits himself. (Ex.3,5)

#45.  Denial contradicts information recorded by LCSO Probable Cause Statement

for Incident #06-189556 **BURGLARY** (Ex. 5)

#47. Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) QUINTANA and RICHARD did detain and interrogate LEHMAN for more than forty (40) minutes before PREZPOLEWSKI arrived on the scene.

#48. Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO Dispatch Sheet (Ex 2) and LCSO RLEO (Ex 4)  No emergency was reported to or recorded by LCSO.

#49. Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1)

#50. Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) PREZPOLEWSKI did arrive more than forty-five (45) minutes after BULLOCH's 911 emergency call for assistance.

#51. A reasonable person would offer evidence that benefits himself. Statement signed by Santos (Ex.3) and LCSO Probable Cause Statement (Ex.5)

#52. Denied, yet PREZPOLEWSKI did accuse LEHMAN of being paranoid that "everyone was out to get him".

#53. Denied, yet LEHMAN stated that Lee COUNTY Deputy Juan Santos ( ID # 02198-south) witnessed the admissions, implications and apologies, then he warned participants present that they were involved in local harassment, a punishable offense. The situation was properly identified and resolved with the assistance of Deputy Juan Santos. Deputy Santos signed statement that verifies the harassment that LEHMAN complained of.

#55. Denied, yet BULLOCH came from his residence, approached then he calmly stated to PREZPOLEWSKI, with LEHMAN present, that he was in "fear for his life", then further stated that this "fear for his life" was a result of LEHMAN's

behavior. LEHMAN's  neighbor, Anselmo Hernandez witnessed this incident, as well as all other outdoor activities.

#58.  A reasonable person would offer irrefutable video evidence that benefits himself.

#61.  A reasonable person would offer irrefutable video evidence that benefits himself.

#67.  Denied, yet witnesses, including BULLOCH, saw  PREZPOLEWSKI handcuffed  LEHMAN, and other witnesses saw  LEHMAN  handcuffed.

#69.  Denial contradicts Florida Statute 394.459 Rights of Patients (Ex 10) the  BA Handbook Appendix G-8  (Ex.6)

#70.  Denial contradicts the BA Handbook Appendix G-8 (Ex.6) and Florida Statute 394.459  Rights of Patients (Ex 10)

#71.  Denial contradicts the BA Handbook Appendix G-8 (Ex.6)

#72.  Denial contradicts information recorded by LCSO Incident Recall Sheet (Ex.1) and LCSO RELO (Ex 4)

Denials to  #69-72 deny statements taken "word for word" directly from documents that control Involuntary Baker Act Examinations; therefore, Plaintiffs allege Defendants did not form their belief after an inquiry reasonable under the circumstances, contrary to Federal Rules of Civil Procedure,  Rule 11 (b).

#73.  Denied, yet the record does not indicate that  LEHMAN  resisted in any way.

#74.  Denial contradicts Florida Statute 394.455  Definitions (18) Mental Illness (Ex. 11) and BA Handbook Appendix G-6 (3) (Ex.7).

#75-79.  A reasonable person would offer evidence that benefits himself.

#83.  Denied, yet a reasonable officer would not believe that it is lawful to Baker Act a law abiding citizen, who is mentally ill, for merely dancing and videotaping.

#120.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#121.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#122.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#123.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#124.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#125.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#126.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#127.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#128.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#129.  Denial contradicts BA Handbook Appendix G-3 (Ex. 8)

#130.  Denial contradicts information recorded on LCSO Incident Recall Sheet (Ex. 1) and LCSO RELO (Ex. 4)

#131.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#132.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

#135.  Denial contradicts information recorded on LCSO RELO (Ex. 4)

All remaining allegations not specifically addressed by the Plaintiffs can be construed as true as they are well pled.  The remaining allegations pertain to DEPUTIES unrecorded unreasonable searches of the Plaintiffs home, vehicles and belongings. Witnesses, including BULLOCH and Anselmo Hernandez who stood in their respective front yards, can confirm that the DEPUTIES did enter Plaintiffs home and did enter their vehicles.

## AFFIRMATIVE DEFENSES

1.    Denied. Plaintiffs seek only relief to which they are entitled, and to whatever further relief this Honorable Court orders as just.

2.    Denied. Plaintiffs seek only relief to which they are entitled, and to whatever further relief this Honorable Court orders as just.

3.    Denied.  State and State Agencies are entitled to Eleventh Amendment Immunity in federal court, Edelman v. Jordan, 415 US 651 (1974), but local governments have no immunity from damages flowing from their constitutional violations, and may not assert "good faith" of its agents as a defense to liability. Owen v. City of Independence, MO, 455 US 621 1980 (therefore local governments are left without the benefit of any form of immunity).   Local government entities can be sued for violation of constitutional rights. Monell at 690;  Pembaur v. City of Cincinnati, 475 US 469, 484 n. 12 (1986).

   A suit against a governmental official in his official capacity is deemed a suit against the entity that he represents". Brown v. Neumann, 188 F. 3d 1289, 1290 (11th Cir. 1999) Florida Courts have found that municipal corporations to be the proper party for official capacity suits,  Post v. City of Fort Lauderdale, 750 F. Supp.1131 (S.D. Fla. 1990) Florida Constitution Article VIII Section 1(d) indicates that the sheriff is a county officer.

   As to the individual Defendants:  Qualified Immunity protects government officials who have acted within their discretionary authority from civil trials and other litigation burdens " if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994). Defendants knew or should have known, that their conduct, that the Plaintiffs complain of, violated the rights of the Plaintiffs.

4.    Denied. FRCP Rule 12(b)(1-7)  states a motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.  The simplified notice pleading standard requires that a complaint contain only a short and plain statement of the claim showing the pleader is entitled to relief.  FRCP Rule 8 (a)(2).  Plaintiffs were deprived of constitutional rights by DEPUTIES, conspiring with  BULLOCH,  acting under the color of law.

5.    Denied.  The violations occurred.  Plaintiffs reported the violations.  LCSO refused to address the violations.  Then Plaintiffs filed a complaint.  Defendants then conspired to file a false Answer to cover up recorded information.  All these actions were taken  pursuant to a custom of LCSO.

An entity can be held monetarily liable through "a policy, statement ordinance, regulation or decision officially adopted and promulgated by the body's officers" or "for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body', official decision making body. City of St.Louis v. Praprotnik, 485 US 112, 121. 108 S. Ct. 915, 923, 99 L. Ed.2d 107 (1988) (quoting Monell 436 US at 690-91, 98 S Ct. at 2036)

6.    Denied.  State Sovereign Immunity serves to insulate states from lawsuits in their own court.  Hill v. Dep't of Corrections, 513 So. 2d 129, 131-133 (Fla. 1987),cert. denied, 484 US 1064, 108 S. Ct. 1024, 98 L. Ed. 2d 989 (1988).   State Immunity has no application to claims in federal court, under Section 1983.  When parties raise federal claims (at least under Section 1983) then federal law must determine whether particular governmental entities are subject to suit,  Howlett v. Rose, — US —, 110 s. Ct. 2430, 2444, 110 L Ed. 2d 332 (1990)

7.   Denied.  The usual rule of exhaustion of administrative and judicial state remedies is not a prerequisite to a Section 1983 action.  Monroe v. Pape, 365 US 167, 183 (1961) (exhaustion of judicial remedies is not a prerequisite) Patsy v. Florida Board of Regents, 457 US 496, 501 (1982) Also, the existence of concurrent state remedies is not a bar to a Section 1983 action.  Zinermon v. Burch, 494 US 113, 124 (1990).  State laws requiring pre suit notification prior to initiating a Section 1983 action against the state or one of its subdivisions do not apply.  Felder v. Casey, 487 US 131 (1988)

8.   Denied.  Defendants Answer denies the use of any force, yet Defendants defenses include a privilege to use the degree of force that was necessary for the protection of the Plaintiff  LEHMAN  and others.  LEHMAN's  documented behavior and actions were dancing and videotaping, therefore no force was necessary.  When no force is necessary, any force is excessive.

Chapter 394.463:  It is the policy of this state that the individual dignity of the patient be respected at all times and upon all occasions, including any occasion when the patient is taken into custody, held or transported. Restraining devices utilized for criminals shall not be used in connection with persons who have a mental illness, except for the protection of the patient or others.   Such restraints may be used in accordance with the law, but the dangerous circumstances permitting the use of restraints must be clearly documented.  F.S. 394.459 Rights of Patients (ex. 10) and BA Handbook Appendix G-8 (Ex.6)

9.   Denied.  Plaintiffs clearly request punitive damages against all individual defendants for the intentional and grossly negligent acts of the Defendants.  Plaintiffs were subjected to unreasonable seizures and searches by Defendants acting in bad faith.

F.S. 768.28(5) does not provide immunity for actors of bad faith.  F.S. 768.72 (2) A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct (2a) or gross negligence (2b).

F.S. 768.72 (3) In the case of an employer, principal, corporation or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent meets the criteria specified in subsection (2) and: (b) The officers, directors, or managers of the employer, principal, corporation or other legal entity knowingly condoned, ratified, or consented to such conduct. The blanket denial admits Defendant Scott, knew of the violations, and then consented to the behavior by denying such behavior.

10.    Denied. Punitive damages are available against state or local officials in their individual capacities.  Smith v. Wade, 461 US 30 (1983).

11.    Denied.   Dancing and videotaping were the only actions performed by LEHMAN, reported by BULLOCH and the DEPUTIES and recorded by LCSO. JOHNSON was merely inside a locked residence behind a locked bedroom door when her bedroom was trespassed by DEPUTIES. Plaintiffs exercising their Constitutional Rights did not carelessly or negligently contribute to the injuries and deprivations endured by the Plaintiffs.

## AFFIRMATIVE DEFENSES
Plaintiffs deny each and every Affirmative Defense
and demand strict  proof thereof.

In a responsive pleading, an Officers Answer to a Civil Rights Complaint should be held to a reasonable standard of honesty, a reasonable standard of factual accuracy and a reasonable standard of integrity.  Defendant's Answer does not meet any of these standards as it is undeniably false. The false statements can be verified with a mere review of the  LCSO documents finally provided to the Plaintiffs. The undeniably false Answer and Defenses will force the Plaintiffs to engage in extensive discovery, which will add to the cost of this litigation and delay justice.  This Honorable Court should declare all the allegations in the Complaint to be truthful and accepted since no specific denial was filed.

Defendant submitted the Answer, in bad faith, to the Plaintiffs, thru this Honorable Court, in an attempt to lead the Court to an erroneous conclusion and unreasonably increase the cost of litigation and unreasonably delay Justice for the victims.

For the foregoing reasons Plaintiffs respectfully request this Honorable Court to order a sufficient Answer be filed by the Defendants or to Strike Defendant's Answer and declare all the allegations in the Complaint to be truthful and accepted since no specific denial was filed, and grant the relief requested by the Plaintiffs, and any further relief this Honorable Court deems just.

_Aug  08_ , 2008

Respectfully Submitted,

Shelia Johnson _Shelia Johnson_ And

Kenneth Lehman _Kenneth Lehman_ Pro se.

27386 Dortch Avenue
Bonita Springs Fl
(239) 249-1674

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by
US Mail to                                  on   *Aug  11*      2008


Robert Shearman
Post Office Box 280
Fort Myers Fl 33902-0280

Benjamin Brown
1395 Panther Lane
Suite 300
Naples Fl 34109

```
                                                              PAGE: 000001
COUNTY SHERIFF'S OFFICE                          Requested By: SALTERS,TIFFANY
   10/30/06   Time: 12:29
                             I N C I D E N T   R E C A L L
                                                                          Close
                                        Address        Bldg Apt  Callers Name            P-unit    Date/   Operator
Incident     Time  Type  Pri Dispo                               Callers Address                   Time
                                        Location
                                        Beat  Team/Dist  Area  - - - -  Callers Phone

                                                                                    SO/4104    06/06/05 SECHF
SO060605190316  08:03 22   2  11        DORTCH AVE                                              10:27
                                                                   DORTCH AVE

                         45        04              STH
```

```
Date       Time                                                                          Operator
------- -----                                                                      -----------------
06/06/05 08:05 Incident Initiated By: SO/FAHEY,CATHERINE                                  FAHEY,CATHERINE
06/06/05 08:05 REF TO SIG 22 WITH HE NEIGHBOR 50YOA GRY HAIR  DANCING AND VIDEO TAPING C  37  FAHEY,CATHERINE
06/06/05 08:05 OWFL//COMPL SAYS HE MAY BE ON SIG 31  //LSW GRY SHIRT AND BLUEJEAN  WHK S- 37  FAHEY,CATHERINE
06/06/05 08:05 IG 0                                                                       37  FAHEY,CATHERINE
06/06/05 08:05 Units Recommended    SSO/4100      SSO/CR093      SO/4101                   COGOLIN,KERRI L
06/06/05 08:05 SO/4104          51        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:05 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:05 Primary unit      CHANGED FROM:             To:SO/4104                      COGOLIN,KERRI L
06/06/05 08:06 SO/4105          97        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:06 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:08 SO/4105          97        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:08 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:12 SO/4105          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:12 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:15 SO/4104          97        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:15 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:15 SO/4104          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:15 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:15 SO/4105          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:15 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:26 SO/4104          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:26 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:26 SO/4105          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:26 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:44 SO/4104          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:44 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:44 SO/4105          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:44 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:50 SO/4200          51        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:50 Officer 1 Name: PRZESPOLEWSKI,BRIAN  Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:55 SO/4200          97        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:55 Officer 1 Name: PRZESPOLEWSKI,BRIAN  Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:55 SO/4200          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:55 Officer 1 Name: PRZESPOLEWSKI,BRIAN  Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:55 SO/4104          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:55 Officer 1 Name: GUILLERMO,QUINTANA   Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 08:55 SO/4105          4         location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 08:55 Officer 1 Name: RICHARD,JAMES        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 09:21 SO/4100          51        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 09:21 Officer 1 Name: REAVES,LORRIE        Officer 2 Name:                        COGOLIN,KERRI L
06/06/05 09:21 SO/4100          97        location is     DORTCH AVE                       COGOLIN,KERRI L
06/06/05 09:21 Officer 1 Name: REAVES,LORRIE        Officer 2 Name:                        COGOLIN,KERRI L
```

EX 1

PAGE: 000002

EE COUNTY SHERIFF'S OFFICE

Date: 10/30/06     Time: 12:29

Requested By: SALTERS,TIFFANY

### I N C I D E N T   R E C A L L

| ent | Time | Type | Pri Dispo | Address Location | Bldg Apt | Callers Name Callers Address | P-unit | Close Date/ Time | Operat |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Beat  Team/Dist  Area | | Callers Phone | | | |
| | | | | location is .████ DORSCH AVE | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:25 | SO/4100 | 4 | | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:25 | Officer 1 Name: REEVES,LORRIE | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:33 | SO/4105 | 8 | location is | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:33 | Officer 1 Name: RAMBAUD,JONES | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:33 | SO/4100 | | location is | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:33 | Officer 1 Name: REEVES,LORRIE | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | Unit SO/4104 | | location: WM X12 X51 RC | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | Officer 1 Name: GUILLERMO,QUINTANA | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | SO/4104 | 4 | location is  WM X12 X51 RC | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | Officer 1 Name: GUILLERMO,QUINTANA | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | SO/4200 | | location is | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 09:34 | Officer 1 Name: PRZESPOLEWSKI,BRIAN | | | officer 2 Name: | | 12 | GOGOLIN,KERRI L | |
| 06/06/05 | 09:35 | LOC INFO REVIEWED: C | | | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:04 | Unit SO/4104 | | location: X97 RC | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:04 | Officer 1 Name: GUILLERMO,QUINTANA | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:04 | SO/4104 | 4 | location is  X97 RC | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:04 | Officer 1 Name: GUILLERMO,QUINTANA | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:05 | Unit SO/4104 | | location: X12 X51 VISTA | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:05 | Officer 1 Name: GUILLERMO,QUINTANA | | | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:27 | Unit SO/4104 | | comment: RUTH COOPER | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10: | ████████████,QUINTANA | | officer 2 Name: | | | | GOGOLIN,KERRI L | |
| 06/06/05 | 10:27 | SO/4104 | 8 | location is | | officer 2 Name: | | GOGOLIN,KERRI L | |
| 5/05 | 10:27 | Officer 1 Name: GUILLERMO,QUINTANA | | | | Unit:SO/4104 | 12 | GOGOLIN,KERRI L | |
| 06/06/05 | 10:27 | Disposition | CHANGED From: | To:07 | | Unit:SO/4104 | 12 | | |
| 06/06/05 | 10:27 | Disposition | CHANGED From: | To:11 | | Unit:SO/4104 | 12 | | |

==== Vehicle / Subject Information ====

--------- -----

NO VEHICLE OR SUBJECT RECORDS FOR EVENT LS0060605190316.

-- No REPORT taken.

Ex 1

## For Official Law Enforcement Use Only – Not For Public**

**Some records were entered with different spellings or typos. If you cannot find record, be less specific with your search as follows:  If you cannot find specific address on "Pine View, " type "Pine" without number, to find addresses on "Pineview," "Pine View," or type just "Pin" for more possibilities.

| CR Number | Date/Time | Zn | Source & Type | Location | Complainant | Deputy | Disposition |
|---|---|---|---|---|---|---|---|
| 06-190316 | 6/5/2006 8:03:30 AM | 45 | 911 DISTURBANCE | DORTCH ▓▓▓▓ AVE | ▓▓▓▓ | GUILLERMO,QUINTANA | CONDITION CORRECTED |

REF TO SIG 22 WITH WM NEIGHBOR 50YOA GRY HAIR DANCING AND VIDEO TAPING C

OMPL//COMPL SAYS HE MAY BE ON SIG 31 //LSW GRY SHIRT AND BLUJEANS UNK S

IG 0

LOC INFO REVIEWED: C

☒

**In accordance with Florida State Statutes s.119.07(3)(f), F.S. and s.365.171(15), F.S., and LCSO policy, incidents reported through 911 or incidents related to a sexual offense or child abuse MUST NOT be disclosed to the public. Refer the public to the Incidents by Street search on the LCSO public web site at http://www.sheriffleefl.org/crimeactivity.htm

Employee Intranet Home

Ex 2

Deputy Juan Santos            ID# 02198   South District

I witnessed a burglary in progress, signed a probable cuase statement to document the incident. I was contacted several times by the witness coordination department to be on standby to testify. I believe that matter has been resolved.

During the course of the burglary investigation one suspect, Justin Robert Thomsen told deputies about the harassment games that he and other neighbors participated in to make me feel unwanted in my neighborhood

Anselmo Hernandez, the victim of the burglary, admitted to deputies that he and his family participated in harassment. Anselmo and Justin apologized to me in front of deputies for their involve- ment Several other young adults and children that also took part in the harassment apologized.

Deputy Santos explained to those present that they were involv in "local harassment" a punishable offense.  Children told deputies that an adult mexican male recruited them to participate in the " crazy-man " games, as the children called it.You assured me and the children that you would talk to said male, who resides at 27413 Dortch Ave.

After the burglary investigation was completed, you stopped your vehicle at adult mexican male's residence. I assume you had a talk with said neighbor.

I would appreciate a brief statement from you that verifies harassment was taking place and that you warned participants that "local harassment is a punishable offense.
My phone number is (239) 495 0773.
There is always an answering machine on, so feel free to leave that information on the recorder. I appreciate your time and cooperation.

Thank You
Kenneth Lehman

*K Lehman*

*hand delivered*
*FIRST Attempt 10/15/06*

*Second Attempt 10/24/06*
*Certified mail 1*

*hand delivered*          *6-16-07*
*Deputy Santos*

*Ex 3*

**Report of Law Enforcement Officer initiating involuntary Examination**
State of Florida, County of _____ Lee _____, Florida

_Deputy Quintana_, an a law enforcement officer certified by the State of Florida, in my opinion

_Kenneth L. Lehman_ appears to meet the following criteria for involuntary examination:

1. I have reason to believe said person has a mental illness pursuant to Section 394.455 (18), F.S., and because of the mental illness (check a or b):

☐ a. Person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; OR

☐ b. Person is unable to determine for himself/herself whether examination is necessary, AND

2. Either (check all that apply)

☐ a. Without care or treatment said person is likely to suffer from neglect or refuse to care for himself/herself, and such neglect or refusal poses a real and present threat of substantial harm to his/her well-being and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; AND/OR.

☒ b. There is substantial likelihood that without care or treatment the person will cause serious bodily harm to (check one or both) ☒ self ☒ others in the near future, as evidenced by recent behavior.

Circumstances supporting this opinion, including specific information about the person's behavior, threats and actions and information offered by others:

Above listed Individual exhibiting fears of "everyone is out to get him". Lehman appears to be irrational in thoughts & fear exists he will harm himself or Another person.

Signature of Law Enforcement Officer ___ #05229 ___   Date 06/05/2006   Time 10 am/pm

Printed Name of Law Enforcement Officer ___ Dep Quintana ___

Full Name of Law Enforcement Agency (printed) Lee Co. Sheriff's Office

Badge or ID Number #05229

Law Enforcement Case Number 06-190316

a. Has the law enforcement officer initiating this examination completed a 40-hour Crisis Intervention Training program?   ☐ yes   ☒ no

b. Has the law enforcement officer initiating this examination completed the Baker Act training offered through FMHI?   ☐ yes   ☒ no

c. Was the examination initiated in the officer's capacity as a school resource officer?   ☐ yes   ☒ no

d. Does the person have a drug or alcohol involvement in addition to a mental illness (does not disqualify for Baker Act admission)
☒ yes   ☐ no   ☐ unknown

By Authority of s. 394.463(2)(a) 2. Florida Statutes
CF-MH 3052a, Feb 05 (obsoletes previous editions)   (Mandatory Form)

BAKER ACT on 6/5/06 LCSO 259

Ex 4

| OBTS No | Agency Report Number | PROBABLE CAUSE STATEMENT | 1. Arrest (cont) | 3. Arrest Affidavit |
|---|---|---|---|---|
| | 06-189556 | | 2. Notice to Appear (cont) | 4. Complaint Affidavit |
| Agency ORI Number | Agency Arrest Number | Lee County Sheriff's Office | | 5. Request for Capias |
| FL0360000 | | | JUVENILE | |

| Defendant Name (last, first, middle) | Alias |
|---|---|
| Bowers, Jonathan Dallas | |

The undersigned certifies and swears that he/she has just and reasonable grounds to believe that the above named Defendant committed the following violation of law: BURGL. OF DWELLING UNARMED NO ASSLT OR BATT, LARC PETIT 1ST OFF

On the **4** day of **June** **2006** at **1310** ( ) A.M. (X) P.M. (Specifically include facts constituting cause for arrest.)

WRITE NARRATIVE IN THE 1st PERSON (I.e. I witnessed the suspect)     GIVE BASIS FOR KNOWLEDGE OF THE INCIDENT (I.e. I was told by)

**NARRATIVE**

On this date this Deputy was dispatched to 27373 Dortch Avenue reference to a burglary in progress. Upon arrival this Deputy was contacted by the victim Anselmo Hernandez who stated that the two boys who are his neighbor went into his garage and removed a box from his garage.

Mr. Hernandez pointed to the house located at 27376 Dortch Ave as the house where the juveniles offenders went inside after the burglary.

This Deputy knocked on the door of 27376 Dortch Ave and made contact with both juveniles Justin Robert Thomsen and Jonathan Bowers.

Mr. Anselmo and neighbor Mr. Kenneth Lehman identified the two juveniles as the one who broke into his garage and took his property.

Upon seeing Mr. Lehman identify him as the offender who broke into Mr. Hernandez garage, Jonathan Bowers made an unsolicited response stating "we only took some sodas from his garage".

Justin Thomsen went into the tree and brought back a carton of Fanta orange soda and said "here is what we took" and gave it to this Deputy.

Mr. Hernadez identified the box of sodas as his property, and stated that he never gave the juveniles permission to take his property, and that this is the second time they go inside his property and steal things.

Mr. Hernandez stated he will prosecute because he is tired of this juveniles stealing thing from his garage, both Mr. Hernandez and Mr. Lehman gave sworn written statements as to what happen.

Both Juveniles were arrested and charged with burglary. Juvenile Jonathan Bowers was under house arrest for burglary to a conveyance.

All this took place in Lee County Florida.

| Anults Only | | Date | |
|---|---|---|---|
| ( ) Hold for First Appearance | | | |
| Do Not Bond Out. Reason: | | | |
| I swear/affirm the above and reverse and attached statements are true and correct. OFFICERS SIGNATURE | | Location of Appearance (Court Room No. Address) | |
| | | Returnable Court Date | Returnable Court Time ( ) A.M. ( ) P.M. |
| NAME (printed) Santos, Juan       ID No./Dist 02198-south | | Release Date | Release Time ( ) A.M. ( ) P.M. |
| Sworn and subscribed before me the undersigned authority This            day of | | Releasing Officer | |
| SIGNATURE of Person Authorized to Administer Oath | | | |
| PRINTED Name/Title of Person Authorized to Administer Oath | | Page 2 of | Page 2 |

**B O N D   I N F O R M A T I O N**

Ex 5

persons into custody upon entry of an ex parte order or the execution of a certificate for involuntary examination by an authorized professional and to transport that person to the nearest receiving facility for examination. This might result in the Sheriff's Office being responsible for certain transportation and municipal police responsible for others. A copy of the formal action taken by the Board of County Commissioners should be available through the County Attorney.

3. **Do I have any responsibility to transport persons for voluntary examinations?**

No. There is nothing in the Baker Act to require law enforcement officers to transport persons for voluntary examinations, since they are both willing and able to provide consent to the examination. However, there is nothing to prohibit such transportation if the officer and their Department (including legal counsel) concur.

4. **Can I take a person who meets the criteria for involuntary examination to jail instead of a Baker Act receiving facility if they have committed a misdemeanor?**

The Baker Act states that any law enforcement officer who has custody of a person based on either non-criminal or minor criminal behavior that meets the statutory guidelines for involuntary examination, shall transport the person to the nearest receiving facility for examination. [s. 394.462(1)(f), F.S.]

5. **Can I use handcuffs and other restraints when transporting persons with mental illness to a Baker Act receiving facility?**

The Baker Act states that the individual dignity of the person shall be respected at all times and upon all occasions, including any occasion when the person is taken into custody, held or transported. Procedures, facilities, vehicles, and restraining devices utilized for criminals or those accused of crime shall not be used in connection with persons who have a mental illness, except for the protection of the person or others. Where the dangerous circumstances are clearly documented, such restraints may be used.

6. **Under what conditions can I delegate the responsibility to someone else to do the transport? How is this documented?**

The Baker Act states that the designated law enforcement agency may decline to transport the person to a receiving facility only if:

a. The jurisdiction designated by the county has contracted with an emergency medical transport service or private transport company for transportation of persons to receiving facilities pursuant to this section at the sole cost of the county; and the law enforcement agency and the emergency medical transport service or private transport company agree that the continued presence of law enforcement personnel is not necessary for the safety of the person or others. When a jurisdiction has entered into a contract with an emergency medical transport service or a private transport company for transportation of persons to receiving facilities, such service or company shall be given preference for transportation of persons from nursing homes, assisted living facilities, adult day care centers, or adult family-care homes, unless the behavior of the person being transported is such that transportation by a law enforcement officer is necessary for the safety of the subject or others.

b. When a law enforcement officer takes custody of a person pursuant to this part, the officer may request assistance from emergency medical personnel if such assistance is needed for the safety of the officer or the person in custody. If the appropriate law enforcement officer believes that a person has an emergency medical condition as defined in s. 395.002, F.S. the person may be first transported to a hospital for emergency medical treatment, regardless of whether the hospital is a designated receiving facility. Nothing in this section shall be construed to limit emergency examination and treatment of incapacitated persons provided in accordance with the provisions of s. 401.445.

c. When a member of a mental health overlay program or a mobile crisis response service is a professional authorized to initiate an involuntary examination pursuant to s. 394.463, F.S. and that professional evaluates a person and determines

*Ex 6*

4. If the person is on involuntary examination status and a Petition for Involuntary Placement has already been filed with the court, the appropriate law enforcement agency will be provided a copy of the petition form (CF-MH 3032) and requested to return the person to the facility from which the petition was filed.

5. If a person under a court's Order for Involuntary Placement (CF-MH 3008) at a treatment facility leaves the facility without authorization, the administrator may authorize a search for the person and the return of the person to the facility. While the statute is silent with regard to receiving facilities, it is presumed that the court order itself would provide the required authority. The administrator of the facility may request the assistance of a law enforcement agency in the search for and return of the person and may provide a copy of the order (CF-MH 3008) to law enforcement.

## Confidentiality of Clinical Records
### 394.4615, FS   65E-5.250, FAC

Any person, agency, or entity receiving information pursuant to the Baker Act shall maintain such information as confidential and exempt from the provisions of Florida's public records law. [s. 119.07(1), F.S.]

Therefore, any Baker Act documents initiating involuntary examinations, or transportation of persons to a receiving facility, may not be released by law enforcement.

# Questions & Answers
## Law Enforcement Officers

1. How does the Baker Act define a "law enforcement officer?"

   A law enforcement officer means a law enforcement officer as defined in s. 943.10, F.S. Therefore, as Chapter 943 is revised in future legislative sessions, the Baker Act will not have to be revised further. [s. 394.455, F.S.]

2. Do I have to be acting in my official capacity or "on duty" to initiate an involuntary examination or to transport a person for such an examination?

The statute doesn't distinguish between official and off-duty actions but the Florida Administrative Code requires that an officer must be working in the course of his or her official duties to initiate an involuntary examination under the Baker Act [Chapter 65E-5.280(2)(a), F.A.C.] Liability issues might also arise if acting in an off-duty capacity. Department legal counsel should be consulted where the officer is considered to be "on duty" 24 hours per day, 7 days per week.

3. I'm a law enforcement officer, not a mental health professional. How am I supposed to diagnose mental illness?

   Law enforcement officers, in the course of their duties, probably have more day-to-day interaction with persons who have serious mental illness than many mental health professionals. However, officers are not expected to diagnose mental illness. Mental illness is defined in the Baker Act to mean:

   An impairment of the emotional processes that exercise conscious control of one's actions or of the ability to perceive or understand reality, which impairment substantially interferes with a person's ability to meet the ordinary demands of living, regardless of etiology. For the purposes of this part, the term does not include retardation or developmental disability as defined in Chapter 393, intoxication, or conditions manifested only by antisocial behavior or substance abuse impairment. [s. 394.455 (18), F.S.]

   It is important for officers not to unnecessarily invoke the Baker Act for persons who seem to be intoxicated, retarded, or criminal unless there is reason to believe they also have co-occurring mental illness as it is defined in the law.

## Criteria for Initiating Involuntary Examinations
### s. 394.463, F.S.

1. What are the criteria for initiating an involuntary examination under the Baker Act?

   A person may be taken to a receiving facility for involuntary examination if there is reason to believe that he or she has a mental illness and because of his or her mental illness:

---

EX 7

The statute is silent as to whether the officer must personally see the person's behavior but there is no expectation that the officer should be able to clinically diagnose mental illness or predict dangerousness. Evidence of likelihood of harm to self or others is defined solely by the person's "recent behavior." The law requires that the law enforcement officer's report detail the "circumstances" under which the person was taken into custody, not personal observations. The Baker Act is a civil law, not a criminal one; probable cause is not required.

Since the officer is rarely on site when the event prompting the Baker Act call occurs, his or her judgment may often be based upon the statements by the person or the credibility of the witnesses to the event. For example, one can usually presume a family contacting law enforcement about a family member has their loved one's best interest in mind unless the officer believes that the call to law enforcement may be a retaliatory act. Certainly, if the person admits to the accuracy of the family's report of active or passive danger, it might be unwise or even negligent of an officer who has been told this information not to take the person to a facility for examination. It is not the officer's job to conduct an examination; only to initiate the examination by taking the person to a designated receiving facility where an expert must perform the involuntary examination.

Section 394.459(10), F.S. states that "any person who acts in good faith in compliance with the provisions of this part is immune from civil or criminal liability for his or her actions in connection with the admission, diagnosis, treatment, or discharge of a person to or from a facility. However, this section does not relieve any person from liability if such person commits negligence." Law enforcement officers should consult with their department's legal counsel in determining whether there is greater liability in:

- Failing to act when credible witnesses allege passive or active danger and the person ultimately suffers harm or commits an act of violence, or

- Acting to protect a person even though a skilled clinician may ultimately determine that the person does not meet the statutory criteria.

Most attorneys would look at the seriousness of the consequences to each of the above decisions and suggest that the examination be initiated by law enforcement,

leaving it to the experts to confirm whether the criteria have been met. While common sense should always prevail, each law enforcement department needs to develop explicit policies and procedures to reflect the actions, which should be taken in such circumstances.

The law enforcement officer, acting in the course of his or her official duties, must use the mandatory form entitled "Report of Law Enforcement Officer Initiating Involuntary Examination (CF-MH 3052a). This form, along with the mandatory form entitled "Transportation to Receiving Facility" (CF-MH 3100) must accompany the person to the nearest receiving facility for retention in the person's clinical record.

## Initiation of Involuntary Examination by Others
### 394.463(2)(a) 1 &3, FS    65E-5.280, FAC

If the involuntary examination has been initiated by the circuit court, a court order will be given to the law enforcement officer to deliver with the person to the nearest receiving facility where it will be made a part of the person's clinical record.

A law enforcement officer acting in accordance with an ex parte order may serve and execute such order on any day of the week, at any time of the day or night and may use such reasonable physical force as is necessary to gain entry to the premises, and any dwellings, buildings, or other structures located on the premises and to take custody of the person who is the subject of the ex parte order.

The court order for involuntary examination, along with the petition(s) seeking the order, will be delivered by the law enforcement officer to the facility to be placed in the person's clinical record along with the "Transportation to a Receiving Facility" form (CF-MH 3100) completed by the law enforcement officer. [ss. 394.463(2)(a), (c) and (d), F.S.]

If the involuntary examination has been initiated by a physician, clinical psychologist, psychiatric nurse, clinical social worker, or licensed mental health counselor, a certificate must be completed by the professional stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based.

Baker Act Handbook and User Reference Guide • 2006
State of Florida Department of Children & Families

$Ex\ 8$

that transportation to a receiving facility is needed, the service, at its discretion, may transport the person to the facility or may call on the law enforcement agency or other transportation arrangement best suited to the needs of the person.

d. When a transportation exception plan has been approved by the Board of County Commissioners and the Secretary of the Department of Children and Family Services, among others. [s. 394.462(3), F.S.]

7. **How can I find out which Baker Act receiving facilities are in my jurisdiction and their addresses?**

The District Office of the Department of Children and Family Services can provide you with a list of the names and addresses of all Baker Act receiving facilities in your locale.

8. **Do I have to take the person to the nearest Baker Act receiving facility or can I take them to another facility where the person, caregiver, or mental health professional has asked me to take them?**

The Baker Act requires you to take all patients to the nearest receiving facility, unless the person is suffering from an emergency medical condition, in which case they should be taken to the nearest emergency room. The person can be later transferred to another facility if requested by the person or their guardian.

9. **Do I have to return to a hospital to transfer the person to another facility?**

No. Once the person is taken to the hospital, the state's Baker Act and the federal COBRA law require the hospital to arrange for appropriate transfer, when necessary.

## At the Facility

1. **Can the Baker Act receiving facility refuse to accept the person I bring to them?**

No. The Baker Act states that the nearest receiving facility must accept persons brought by law enforcement officers for involuntary examination. If the receiving facility believes the person should be "medically cleared" the facility can arrange appropriate medical transport for this purpose. If the receiving facility is at capacity, it should accept the person and arrange an appropriate transfer.

2. **Do I have to wait at a hospital for the person to be medically screened, treated, or have their insurance verified?**

No. The officer's only duties are to present the person and the required completed paperwork. However, if the person is acting in a dangerous manner, beyond the ability of the hospital staff to manage, the officer should stay to assist for a very temporary period until hospital clinical or security staff can arrive.

3. **Can I take my weapon into a psychiatric facility?**

No. The Baker Act states that except as authorized by law or as specifically authorized by the person in charge of each hospital providing mental health services under this part, it is unlawful to introduce into or upon the grounds of such hospital any firearms or deadly weapons. However, when law enforcement is called in response to an alleged crime occurring at such a hospital, the officer should follow its department's procedures.

Additionally, the administrator of the facility has the authority to make exceptions to the no firearms policy in the case of law enforcement officers while in the performance of their duty. [s. 394.458, F.S.]

4. **What forms do I have to present to the Baker Act receiving facility staff? Where can I get copies of the forms?**

The Baker Act form entitled "Transportation to a Receiving Facility" (CF-MH 3100) must be presented each time a law enforcement officer takes a person to a receiving facility for involuntary examination, regardless of whether the examination is initiated by a judge, a mental health professional, or by the officer. In addition, the Baker Act form entitled "Report of Law Enforcement Officer Initiating Involuntary Examination" (CF-MH 3052a) must be completed when the officer, as opposed to the judge or mental health professional, initiates the examination. These forms, as well as all other Baker Act forms can be obtained from the district office of the Department of Children and Families. [Chapter 65E-5.280, F.A.C.]

Ex 9

place which is outside of the grounds of such hospital, except as authorized by law or as specifically authorized by the person in charge of such hospital.

(2) A person who violates any provision of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

History.—s. 1, ch. 75-253; s. 201, ch. 77-147; s. 1, ch. 77-174; s. 6, ch. 98-160.

**394.459 Rights of patients.—**

(1) RIGHT TO INDIVIDUAL DIGNITY.—It is the policy of this state that the individual dignity of the patient shall be respected at all times and upon all occasions, including any occasion when the patient is taken into custody, held, or transported. Procedures, facilities, vehicles, and restraining devices utilized for criminals or those accused of crime shall not be used in connection with persons who have a mental illness, except for the protection of the patient or others. Persons who have a mental illness but who are not charged with a criminal offense shall not be detained or incarcerated in the jails of this state. A person who is receiving treatment for mental illness shall not be deprived of any constitutional rights. However, if such a person is adjudicated incapacitated, his or her rights may be limited to the same extent the rights of any incapacitated person are limited by law.

(2) RIGHT TO TREATMENT.—

(a) A person shall not be denied treatment for mental illness and services shall not be delayed at a receiving or treatment facility because of inability to pay. However, every reasonable effort to collect appropriate reimbursement for the cost of providing mental health services to persons able to pay for services, including insurance or third-party payments, shall be made by facilities providing services pursuant to this part.

(b) It is further the policy of the state that the least restrictive appropriate available treatment be utilized based on the individual needs and best interests of the patient and consistent with optimum improvement of the patient's condition.

(c) Each person who remains at a receiving or treatment facility for more than 12 hours shall be given a physical examination by a health practitioner authorized by law to give such examinations, within 24 hours after arrival at such facility.

(d) Every patient in a facility shall be afforded the opportunity to participate in activities designed to enhance self-image and the beneficial effects of other treatments, as determined by the facility.

(e) Not more than 5 days after admission to a facility, each patient shall have and receive an individualized treatment plan in writing which the patient has had an opportunity to assist in preparing and to review prior to its implementation. The plan shall include a space for the patient's comments.

(3) RIGHT TO EXPRESS AND INFORMED PATIENT CONSENT.—

(a) Each patient entering treatment shall be asked to give express and informed consent for admission and treatment. If the patient has been adjudicated incapacitated or found to be incompetent to consent to treatment, express and informed consent to treatment shall be sought instead from the patient's guardian or

guardian advocate. If the patient is a minor, express and informed consent for admission and treatment shall also be requested from the patient's guardian. Express and informed consent for admission and treatment of a patient under 18 years of age shall be required from the patient's guardian, unless the minor is seeking outpatient crisis intervention services under s. 394.4784. Express and informed consent for admission and treatment given by a patient who is under 18 years of age shall not be a condition of admission when the patient's guardian gives express and informed consent for the patient's admission pursuant to s. 394.463 or s. 394.467. Prior to giving consent, the following information shall be disclosed to the patient, or to the patient's guardian if the patient is 18 years of age or older and has been adjudicated incapacitated, or to the patient's guardian advocate if the patient has been found to be incompetent to consent to treatment, or to both the patient and the guardian if the patient is a minor: the reason for admission, the proposed treatment, the purpose of the treatment to be provided, the common side effects thereof, alternative treatment modalities, the approximate length of care, and that any consent given by a patient may be revoked orally or in writing prior to or during the treatment period by the patient, the guardian advocate, or the guardian.

(b) In the case of medical procedures requiring the use of a general anesthetic or electroconvulsive treatment, and prior to performing the procedure, express and informed consent shall be obtained from the patient if the patient is legally competent, from the guardian of a minor patient, from the guardian of a patient who has been adjudicated incapacitated, or from the guardian advocate of the patient if the guardian advocate has been given express court authority to consent to medical procedures or electroconvulsive treatment as provided under s. 394.4598.

(c) When the department is the legal guardian of a patient, or is the custodian of a patient whose physician is unwilling to perform a medical procedure, including an electroconvulsive treatment, based solely on the patient's consent and whose guardian or guardian advocate is unknown or unlocatable, the court shall hold a hearing to determine the medical necessity of the medical procedure. The patient shall be physically present, unless the patient's medical condition precludes such presence, represented by counsel, and provided the right and opportunity to be confronted with, and to cross-examine, all witnesses alleging the medical necessity of such procedure. In such proceedings, the burden of proof by clear and convincing evidence shall be on the party alleging the medical necessity of the procedure.

(d) The administrator of a receiving or treatment facility may, upon the recommendation of the patient's attending physician, authorize emergency medical treatment, including a surgical procedure, if such treatment is deemed lifesaving, or if the situation threatens serious bodily harm to the patient, and permission of the patient or the patient's guardian or guardian advocate cannot be obtained.

6



ords, progress notes, charts, and admission and discharge data, and all other information recorded by a facility which pertains to the patient's hospitalization or treatment.

(4) "Clinical social worker" means a person licensed as a clinical social worker under chapter 491.

(5) "Community facility" means any community service provider contracting with the department to furnish substance abuse or mental health services under part IV of this chapter.

(6) "Community mental health center or clinic" means a publicly funded, not-for-profit center which contracts with the department for the provision of inpatient, outpatient, day treatment, or emergency services.

(7) "Court," unless otherwise specified, means the circuit court.

(8) "Department" means the Department of Children and Family Services.

(9) "Express and informed consent" means consent voluntarily given in writing, by a competent person, after sufficient explanation and disclosure of the subject matter involved to enable the person to make a knowing and willful decision without any element of force, fraud, deceit, duress, or other form of constraint or coercion.

(10) "Facility" means any hospital, community facility, public or private facility, or receiving or treatment facility providing for the evaluation, diagnosis, care, treatment, training, or hospitalization of persons who appear to have a mental illness or have been diagnosed as having a mental illness. "Facility" does not include any program or entity licensed pursuant to chapter 400.

(11) "Guardian" means the natural guardian of a minor, or a person appointed by a court to act on behalf of a ward's person if the ward is a minor or has been adjudicated incapacitated.

(12) "Guardian advocate" means a person appointed by a court to make decisions regarding mental health treatment on behalf of a patient who has been found incompetent to consent to treatment pursuant to this part. The guardian advocate may be granted specific additional powers by written order of the court, as provided in this part.

(13) "Hospital" means a facility licensed under chapter 395.

(14) "Incapacitated" means that a person has been adjudicated incapacitated pursuant to part V of chapter 744 and a guardian of the person has been appointed.

(15) "Incompetent to consent to treatment" means that a person's judgment is so affected by his or her mental illness that the person lacks the capacity to make a well-reasoned, willful, and knowing decision concerning his or her medical or mental health treatment.

(16) "Law enforcement officer" means a law enforcement officer as defined in s. 943.10.

(17) "Mental health overlay program" means a mobile service which provides an independent examination for voluntary admissions and a range of supplemental onsite services to persons with a mental illness in a residential setting such as a nursing home, assisted living facility, adult family-care home, or non-residential setting such as an adult day care center. Independent examinations provided pursuant to this part through a mental health overlay program must only be provided under contract with the department for this service or be attached to a public receiving facility that is also a community mental health center.

(18) "Mental illness" means an impairment of the mental or emotional processes that exercise conscious control of one's actions or of the ability to perceive or understand reality, which impairment substantially interferes with a person's ability to meet the ordinary demands of living, regardless of etiology. For the purposes of this part, the term does not include retardation or developmental disability as defined in chapter 393, intoxication, or conditions manifested only by antisocial behavior or substance abuse impairment.

(19) "Mobile crisis response service" means a non-residential crisis service attached to a public receiving facility and available 24 hours a day, 7 days a week, through which immediate intensive assessments and interventions, including screening for admission into a receiving facility, take place for the purpose of identifying appropriate treatment services.

(20) "Patient" means any person who is held or accepted for mental health treatment.

(21) "Physician" means a medical practitioner licensed under chapter 458 or chapter 459 who has experience in the diagnosis and treatment of mental and nervous disorders or a physician employed by a facility operated by the United States Department of Veterans Affairs which qualifies as a receiving or treatment facility under this part.

(22) "Private facility" means any hospital or facility operated by a for-profit or not-for-profit corporation or association that provides mental health services and is not a public facility.

(23) "Psychiatric nurse" means a registered nurse licensed under part I of chapter 464 who has a master's degree or a doctorate in psychiatric nursing and 2 years of post-master's clinical experience under the supervision of a physician.

(24) "Psychiatrist" means a medical practitioner licensed under chapter 458 or chapter 459 who has primarily diagnosed and treated mental and nervous disorders for a period of not less than 3 years, inclusive of psychiatric residency.

(25) "Public facility" means any facility that has contracted with the department to provide mental health services to all persons, regardless of their ability to pay, and is receiving state funds for such purpose.

(26) "Receiving facility" means any public or private facility designated by the department to receive and hold involuntary patients under emergency conditions or for psychiatric evaluation and to provide short-term treatment. The term does not include a county jail.

(27) "Representative" means a person selected to receive notice of proceedings during the time a patient is held in or admitted to a receiving or treatment facility.

(28) "Secretary" means the Secretary of Children and Family Services.

(29) "Transfer evaluation" means the process, as approved by the appropriate district office of the department, whereby a person who is being considered for

2



by a court pursuant to s. 394.467 and continues to meet the criteria for involuntary placement. When transfer to voluntary status occurs, notice shall be given as provided in s. 394.4599.

(5) TRANSFER TO INVOLUNTARY STATUS.—When a voluntary patient, or an authorized person on the patient's behalf, makes a request for discharge, the request for discharge, unless freely and voluntarily rescinded, must be communicated to a physician, clinical psychologist, or psychiatrist as quickly as possible, but not later than 12 hours after the request is made. If the patient meets the criteria for involuntary placement, the administrator of the facility must file with the court a petition for involuntary placement, within 2 court working days after the request for discharge is made. If the petition is not filed within 2 court working days, the patient shall be discharged. Pending the filing of the petition, the patient may be held and emergency treatment rendered in the least restrictive manner, upon the written order of a physician, if it is determined that such treatment is necessary for the safety of the patient or others.

History.—s. 8, ch. 71-131; s. 7, ch. 73-133; s. 169, ch. 73-333; s. 8, ch. 79-298; s. 11, ch. 80-212; s. 706, ch. 95-148; s. 17, ch. 96-169; s. 22, ch. 99-394.
Note.—Former s. 394.465.

**394.463 Involuntary examination.—**

(1) CRITERIA.—A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:

(a)1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or

2. The person is unable to determine for himself or herself whether examination is necessary; or

(b)1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or

2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

(2) INVOLUNTARY EXAMINATION.—

¹(a) An involuntary examination may be initiated by any one of the following means:

1. A court may enter an ex parte order stating that a person appears to meet the criteria for involuntary examination, giving the findings on which that conclusion is based. The ex parte order for involuntary examination must be based on sworn testimony, written or oral. If other less restrictive means are not available, such as voluntary appearance for outpatient evaluation, a law enforcement officer, or other designated agent of the court, shall take the person into custody and deliver him or her to the nearest receiving facility for involuntary examination. The order of the court shall be made a part of the patient's clinical record. No fee shall be charged for the filing of an order under this subsection. Any receiving facility accepting the patient

based on this order must send a copy of the order to the Agency for Health Care Administration on the next working day. The order shall be valid only until executed or, if not executed, for the period specified in the order itself. If no time limit is specified in the order, the order shall be valid for 7 days after the date that the order was signed.

2. A law enforcement officer shall take a person who appears to meet the criteria for involuntary examination into custody and deliver the person or have him or her delivered to the nearest receiving facility for examination. The officer shall execute a written report detailing the circumstances under which the person was taken into custody, and the report shall be made a part of the patient's clinical record. Any receiving facility accepting the patient based on this report must send a copy of the report to the Agency for Health Care Administration on the next working day.

3. A physician, clinical psychologist, psychiatric nurse, or clinical social worker may execute a certificate stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based. If other less restrictive means are not available, such as voluntary appearance for outpatient evaluation, a law enforcement officer shall take the person named in the certificate into custody and deliver him or her to the nearest receiving facility for involuntary examination. The law enforcement officer shall execute a written report detailing the circumstances under which the person was taken into custody. The report and certificate shall be made a part of the patient's clinical record. Any receiving facility accepting the patient based on this certificate must send a copy of the certificate to the Agency for Health Care Administration on the next working day.

(b) A person shall not be removed from any program or residential placement licensed under chapter 400 and transported to a receiving facility for involuntary examination unless an ex parte order, a professional certificate, or a law enforcement officer's report is first prepared. If the condition of the person is such that preparation of a law enforcement officer's report is not practicable before removal, the report shall be completed as soon as possible after removal, but in any case before the person is transported to a receiving facility. A receiving facility admitting a person for involuntary examination who is not accompanied by the required ex parte order, professional certificate, or law enforcement officer's report shall notify the Agency for Health Care Administration of such admission by certified mail no later than the next working day. The provisions of this paragraph do not apply when transportation is provided by the patient's family or guardian.

(c) A law enforcement officer acting in accordance with an ex parte order issued pursuant to this subsection may serve and execute such order on any day of the week, at any time of the day or night.

(d) A law enforcement officer acting in accordance with an ex parte order issued pursuant to this subsection may use such reasonable physical force as is necessary to gain entry to the premises, and any dwellings,

15

